## IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF OKLAHOMA

TASHA SHERMAN-HARRIS-     )
GOLSON,                    )
                          )
     Plaintiff,            )
                          )
-vs-                      )    Case No. CIV-21-466-F
                          )
FOREST PARK MUNICIPAL     )
AUTHORITY, TOWN OF FOREST )
PARK, ex rel. FOREST PARK )
POLICE DEPARTMENT, TYARA  )
NASH-RICHMOND, THOMAS     )
GIPSON, JOSEPH MILTON,    )
                          )
     Defendants.           )

## ORDER

Plaintiff Tasha Sherman-Harris-Golson (Golson) is a former employee of defendant Forest Park Municipal Authority, Town of Forest Park, *ex rel.* Forest Park Police Department (Forest Park). She was hired in September of 2018, in the position of reserve police officer. Over a year later, in November of 2019, her employment was terminated.

On May 7, 2021, she filed this action against Forest Park and several of its employees, Tyara Nash-Richmond (Richmond), Thomas Gipson (Gipson), and Joseph Milton (Milton), alleging various employment claims arising under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* (Title VII), 42 U.S.C. § 1981 and 42 U.S.C. § 1983. Upon motions by defendants under Rule 12(b)(6), Fed. R. Civ. P., the court dismissed all claims against Richmond and Gipson, and dismissed certain claims against Forest Park and Milton. The remaining

claims against Forest Park are Title VII claims of gender discrimination, hostile work environment, and retaliation.  The remaining claim against Milton is a § 1983 equal protection claim.

The parties have conducted discovery with respect to the remaining claims, and defendants have moved for summary judgment under Rule 56(a), Fed. R. Civ. P., as to those claims.  Doc. nos. 71 and 73.  Golson has responded to the motions.  Doc. nos. 100 and 102.  Defendants have replied.  Doc. nos. 112 and 114.  As directed, Golson has sur-replied.  Doc. nos.  118 and 119.  Upon review of the parties' submissions, the court makes its determinations.

Standard of Review

"Under Rule 56(a), summary judgment is proper if the record shows 'there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" Throupe v. University of Denver, 988 F.3d 1243, 1250 (10th Cir. 2021) (quoting Sanderson v. Wyo. Highway Patrol, 976 F.3d 1164, 1173 (10th Cir. 2020)). "A dispute is genuine 'if there is sufficient evidence so that a rational trier of fact could resolve the issue either way.'" Id. "'In determining whether a genuine issue of material fact exists, the court must draw all reasonable inferences in favor of the nonmoving party.'" Id.

"The party moving for summary judgment bears the initial burden of showing an absence of any issues of material fact." Tesone v. Empire Marketing Strategies, 942 F.3d 979, 994 (10th Cir. 2019) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986)).  Where "the burden of persuasion at trial would be on the nonmoving party, the movant may carry its initial burden by providing 'affirmative evidence that negates an essential element of the nonmoving party's claim' or by 'demonstrat[ing] to the [c]ourt that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim.'" Id. "If the movant makes this showing, the burden then shifts to the nonmovant to 'set forth

specific facts showing that there is a genuine issue for trial.'" *Id*. (citing <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 250 (1986)).

Where, as here, a defendant seeks summary judgment on the basis of an affirmative defense, the defendant "'must demonstrate that no disputed material fact exists regarding the affirmative defense asserted.'" <u>Johnson v. Riddle</u>, 443 F.3d 723, n. 1 (10th Cir. 2006) (quoting <u>Hutchinson v. Pfeil</u>, 105 F.3d 562, 564 (10th Cir. 1997)). "'If the defendant meets this initial burden, the plaintiff must then demonstrate with specificity the existence of a dispute material fact.'" *Id*.; *see also*, <u>Hameric v. Wilderness Expeditions, Inc.</u>, 6 F.4th 1108, 1122 (10th Cir. 2021) ("[A] plaintiff, upon the defendant raising and supporting an affirmative defense, need only identify a disputed material fact relative *to the affirmative defense*.") (emphasis in original). "If the plaintiff fails to make such a showing, the affirmative defense bars [her] claim, and the defendant is then entitled to summary judgment as a matter of law.'" <u>Johnson</u>, 443 F.3d at n. 1.

<u>Relevant Facts</u>

On September 13, 2018, Richmond, who was then serving as Forest Park's Chief of Police, interviewed and hired Golson in the position of reserve police officer. At the time, Forest Park had one full-time police officer, Charles Holmes (Holmes), and seven reserve police officers.

When Golson was hired, she held a full-time peace officer certification from the Council on Law Enforcement Education and Training (CLEET). However, because she had not worked in law enforcement for over five years, Golson was required to complete CLEET refresher training. The refresher training took place from October 16, 2018 to October 26, 2018.

During the training, Golson, an African-American female, filed a "Student Incident Statement" with CLEET complaining of race discrimination by an instructor. Specifically, Golson complained of remarks made by the instructor

during a class which involved the topic of sex trafficking.  Golson reported the instructor as stating in part:

> [O]n dealing with prostitution [] if you ever call these places you may get a BBW [] which means Big Beautiful Woman but you better be careful because you might even get a Big Black . . .

Doc. no. 103-6, ECF p. 2.  According to Golson, the instructor "almost said Bitch, but changed it to [Chick, and then] he looked at me [and] the class started laughing and he immediately called [a] break . . ."  *Id*. at ECF p. 1.  Although uncomfortable, Golson walked out of the class "like nothing was wrong" and reported the incident.  *Id*.  There is no evidence the CLEET instructor was a member of the Forest Park Police Department.

Golson testified in deposition that Richmond told her the main purpose she hired her was to place her into a full-time investigator position.  According to Golson, she was supposed to become an investigator after she finished the CLEET refresher training.  In November or December of 2018, Richmond assigned Golson duties of completing background investigations for new applicants.  And Golson, as part of her police training in 2019, completed a pre-employment background investigation course.  However, according to Golson, her investigative duties were taken away by Gipson, a male serving as Forest Park's Assistant Police Chief.  Richmond told Golson that she might return to investigation work, but she needed to concentrate on her training as a reserve police officer.

Golson also testified in deposition that on the day she was hired, Richmond told her not to try to take her job or she would fire her.  She also testified that Richmond told individuals who were evaluating her during her training to change a good performance evaluation because Golson could not be as "good" as Richmond.

Dwayne Doolittle (Doolittle), a male reserve officer, was assigned to train Golson. According to Golson, she discovered that Doolittle was not a certified Field Training Officer (FTO) and she complained to her supervisors.

In January of 2019, Milton, another male reserve officer with the rank of sergeant, was assigned as Golson's FTO. He continued as her FTO until March of 2019. At that time, Gipson became Golson's FTO.

During Golson's employment, Richmond removed Golson's access to her timecard several times because she believed that Golson was clocking in for work when she wasn't scheduled. According to Golson, she did not clock in for work unless she was scheduled.

Golson testified in deposition that one day after her husband picked her up from work, they stopped on the side of the road by her grandmother's house. After they were stopped, Doolittle stopped behind them. Golson testified that Doolittle ran her license plate purportedly because the vehicle's lights were not operational. Golson testified that the vehicle had been in an accident, but the lights had been fixed. According to Golson, Doolittle was trying to obtain her personal information.

Forest Park required all its officers to wear a uniform consisting of a polo shirt with police patches, a badge, and black or navy slacks. The policy applied to all officers—female and male.

Richmond testified in deposition that Golson came dressed in pink puffy pajama pants and a big coat for a "ride-along" with another officer. Richmond told Golson not to clock in as she was dressed inappropriately. Richmond did not issue any type of written reprimand to Golson for dressing inappropriately.

On several occasions, Richmond and Gipson verbally counseled Golson not to wear jeans to work. However, they did not issue her any type of written reprimand for dressing inappropriately. According to Golson, her uniform had been delayed. When she went to pick up her uniform from the uniform shop, she was told that

5

Gipson had instructed the shop to give it to a male officer. Also, according to Gipson, the only policy she was given concerning uniforms was from CLEET and it allowed jeans to be worn.

Milton testified in deposition that he did not personally observe Golson not complying with the uniform policy. He was aware that Gipson had had a discussion with Golson about the uniform policy, but he understood the issue had been resolved.

Richmond purportedly drafted a letter dated May 2, 2019, which stated that Golson's services as a reserve police officer were no longer needed with the police department. The letter did not state any reason for the decision. After receiving advice from counsel that she "needed to have been documenting all the time about what was going on," doc. no. 101-4, ll. 17-18, Richmond did not give the letter to Golson, and it was not placed in her personnel file.

The police department's operations manual required allegations of employee misconduct be recorded on a written report. A formal investigation was required for all serious allegations of misconduct or when an alleged breach of the law or policy had occurred. An informal investigation was required for less serious allegations of misconduct. Doc. no. 101-11, ECF p. 37.

Golson was instructed to receive her firearms qualification from Holmes, who served as the police department's Training Coordinator. Instead, Golson received her training from Paul Gordon, an instructor outside the department. Richmond signed off on Golson's firearms qualification report on May 15, 2019. Golson did not receive a written reprimand for obtaining qualification outside the department.

On May 24, 2019, Richmond went on medical leave. Gipson became the acting Chief of Police for Forest Park.

Gipson prepared a memorandum dated June 4, 2019, requiring all police personnel to wear the designated uniform when reporting for duty. It stated that no jeans were to be worn on patrol. Gipson signed the memorandum on June 5, 2019.

Golson signed the memorandum on June 8, 2019, her first day of work after June 4, 2019.  Milton likewise signed the memorandum upon his first return to work on June 9, 2019.  The record does not reflect any violation of the memorandum by Golson after its issuance.

Milton prepared the schedules for the reserve police officers.  On the schedule prepared by Milton for the month of June 2019, both Golson and Milton were listed as working back-to-back shifts on June 1 and June 8.  According to a declaration of Richmond, who now serves as Forest Park's Town Administrator, Milton did not work on either day.  She avers that there is no record of Milton working from 10:05 a.m. on May 19, 2019 until 1:05 p.m. on June 9, 2019.  Doc. no. 114-1.

On June 5, 2019, Golson inadvertently spoke on an "open mic," criticizing Gipson.  Golson's comments were broadcasted to Forest Park, Oklahoma County Sheriff's Office, neighboring municipalities, and citizens.  Milton testified in deposition that he did not hear Golson's comments, but he knew of other officers from other agencies who had broadcasted comments on an "open mic" by accident.  However, he also testified that none of those officers had criticized the administration.  Golson testified in deposition that she was speaking "facts" about Gipson to a friend. Thereafter, Gipson spoke to Golson about the incident, but he did not issue anything in writing to her at that time.

On June 13, 2019, Golson consulted with counsel to inquire about representing her.

Responding to two separate police calls on June 23, 2019, Golson arrived on the scene in a personal vehicle, a truck, rather than in a marked police vehicle.  Golson's husband was also in the vehicle.  Later, Golson informed Gipson that on one of those calls, she had told Oklahoma County she was having to respond in her personal vehicle, and they said that was fine.  Gipson told Golson that she was not to respond to calls in a personal vehicle, and that there was a vehicle available for

7

her use.  Gipson did not issue a written reprimand to Golson on the matter.  Golson testified in deposition that she did not have a department vehicle that was available to her.  She also testified that she had never had a discussion with Richmond about not using an official police vehicle.  Further, Golson's husband had completed an "Affidavit of Ride-Along" in February of 2019.  Doc. no. 101-30.

In July 2019, a group text advised that all officers would be participating in weapon training.  Golson responded that she was already qualified for her firearm, but she was told that it was for training purposes.  Golson again advised that she was qualified for the year, but she stated that she would attend.  During the texting, Golson called Gipson about the issue, and he said he would take care of it.  Doc. no. 101-16.  Golson called Gipson again stating that "Milton or somebody" was saying in the text that "if you don't think you should be [at the training] for whatever reason, to put in a written request[.]"  Doc. no. 101-17, ECF p. 2, ll. 15-17.  Golson requested approval from Gipson to "be off."  *Id*. at l. 21.  Gipson told her he would "take care of it . . . I'll talk to him."  *Id*. at l. 24; ECF p. 3, l. 2.

In the early morning of July 11, 2019, Golson called Gipson.  During the conversation, she said that Gipson had told her he would get back with her because he was checking to see if he had to suspend her.  Golson asked him who he had "this discussion with yesterday?"  Doc. no. 101-18, p. 2, ll. 16-17.  Gipson told her that he was not going to talk with her "about that right now."  *Id*. at l. 20.  She then told him that "whatever you all are trying to do.  I'm just going to friendly remind you that there was a couple of discussions that I needed to have with you and [Richmond], but haven't had the opportunity."  *Id*., p. 2, l. 25; p. 3, ll. 1-4.

Thereafter, Golson called Gipson again and told him that "on that meeting that I will have with you and [Richmond], [Richmond] will have the opportunity to do a full-blown investigation after I put you guys on notice of a couple of things that had happened."  Doc. no. 101-19, ECF p. 2, ll. 3-7.  She told him that she hadn't gone

into it at the meeting they had had together because she didn't feel "comfortable enough." *Id.*, l. 12.   But she said she felt "comfortable enough to . . . give [him] a reminder of that because it's serious.  That's something that's been going on since January.  So it's serious." *Id*.  ECF p. 2, ll. 13-16.  Gipson responded "All right. Tasha, I'm not . . . I'm not sure what you're talking about."  Golson then stated, "No. You're not sure.  You're absolutely right . . . You're not sure but you are aware because I've been saying this and I just got [the] policy two weeks ago." *Id.*, ECF p. 2, ll. 20-25.  Gipson then said, "Listen. Listen. Listen.  We know what's going - - we know what's going on - - what goes on in the department.  Okay?  We know what goes on in the department." *Id.*, ECF p. 3, ll. 1-4.

Later that same day, while Gipson and Reginald Cobb (Cobb), the Mayor of Forest Park, were speaking with Golson about an issue, Golson raised her voice to the men and, in Gipson's view, acted unprofessionally.

Gipson prepared a "Letter of Suspension Notice" dated July 15, 2019, advising Golson that she would be placed on a two-day suspension beginning on July 15 for the June 5th "open mic" incident and the two June 23, 2019 personal vehicle incidents.  The letter was not signed by Gipson, and according to Golson, the letter was not presented to her.  Also, the letter was not placed in Golson's employment file.

On July 16, 2019, Gipson informed Golson that he was considering suspending her from her duties for past misconduct.  Gipson viewed Golson's conduct in response to that information to be unprofessional.  Gipson did speak to Golson about her work performance issues and his intention to place her on suspension.

On July 16, 2019, Milton prepared a written formal complaint against Golson to Gipson and Forest Park's Board of Trustees, recommending her "removal/dismissal/separation."  Doc. no. 71-9.  Milton mentioned Golson showing

up in a personal vehicle, going outside the department to get weapons qualifications in defiance of leadership direction, and refusing the gun range day.  He also mentioned issues with scheduling her for work.  Milton's complaint was not placed in Golson's personnel file.

On July 17, 2019, Michael Duffiney (Duffiney) sent an email to Milton setting forth his concerns about Golson.  It included, among other items, her lack of respect or professionalism toward department leadership, her responding to two calls in her personal vehicle and having her husband in the vehicle on one of those calls, and her wearing jeans with her uniform shirt.  The email indicated that the Duffiney and Milton had discussed the matter earlier.  The email was not placed in Golson's personnel file.

On July 19, 2019, Richmond forwarded to Gipson an email she had purportedly prepared on June 6, 2019, while on medical leave, setting forth five ways in which Golson was in violation of the police department's policies and procedures. They included voicing her opinions about departmental activity with civilians; being counseled for not wearing appropriate police attire; questioning other officers and voicing her opinions with other officers; not following the chain of command, and insubordination for not following an instruction to contact Holmes to qualify on her firearm; and for not having signed the uniform policy memorandum as of the date of the email.  Richmond recommended that Golson be terminated or that her probationary period be extended for one year.  The email was not placed in Golson's personnel file.  Richmond testified that any information in the email as to events occurring after May 24, 2019 was based on what she was told by others.

On July 20, 2019, Gipson prepared a letter notifying Golson of a "[pre-termination] hearing" on July 26, 2019, to address certain misconduct and policy violations of the police department.  In the letter, Gipson described the misconduct and policy violations that Golson purportedly committed and to which she was

required to respond.  The letter stated that Golson had been counseled about policy violations, including disrespecting her supervisors and failure to follow lawful directions.  The letter mentioned the firearm qualification incident; the June 5th "open mic" incident; the personal vehicle incidents on June 23, 2019; and the incidents on July 11, 2019 and July 16, 2019.  The letter also stated that complaints had been received from her superior and that Golson had demonstrated an inability to work with her co-workers.  According to Gipson, the "superior" included Holmes and Milton.  According to Golson, she did not receive a copy of Gipson's July 20th letter, but saw it on the day of the hearing, which was rescheduled for August 12, 2019.

On July 24, 2019, Golson called one of the officers from another police department who was present on the scene for one of the calls Golson responded to on June 23, 2019, and he told her Milton had asked him the week before whether there was a "truck" at the scene.  Doc. no. 101-25.  That same day, Golson telephoned Gipson and told him that she had told him it was "a conflict for Milton to intervene" and that she had been trying to tell him and Richmond that she needed to talk to them about "something."  Gipson told her he would call her back.  Doc. no. 101-20, ECF p. 2.  Thereafter, Golson notified Gipson of the alleged sexual harassment by Milton.

Golson also reported her allegations of sexual harassment to the Oklahoma County Sheriff's Office on July 24, 2019.  Doc. no. 73-10.  The incident report mentioned that she had been suspended by her agency and that she wanted to make sure her sexual assault report was investigated.  According to the incident report, Golson reported that Milton "had forced himself upon her" on two occasions.  *Id.*, ECF p. 2.  The first assault occurred on January 19, 2019, and the second assault occurred sometime during April of 2019.  Golson's handwritten notes about the two incidents indicated that she thought the second assault occurred in April.  Doc. no.

73-11, ECF p. 3.  The sheriff's office referred the matter to the Oklahoma State Bureau of Investigation (OSBI) at the end of July of 2019.

Forest Park had a sexual harassment policy prohibiting sexual harassment and advising that any sexual harassment should be reported to the employee's supervisor, the mayor, or a member of the Board of Trustees.  The Forest Park Police Department also had a sexual harassment policy, which required allegations of unwelcome sexual harassment to be reported immediately to an immediate supervisor, patrol supervisor or other person designated to handle employee complaints.  According to Golson, she did not receive a copy of the policy until June or July 2019.  The policy was maintained on the "N-Drive" of the police department's computers, and a physical copy of the policy was kept in the reserve office.  Golson had used the "N-Drive" while doing background investigations for new applicants in early 2019.

Gipson notified Cobb, Don Smitherman (Smitherman), Forest Park's attorney, and possibly Richmond of Golson's sexual harassment claim.  Also, he testified that he notified the OSBI of the claim.  Gipson testified he conducted an internal investigation by interviewing Milton.  According to Gipson, Milton denied the allegations.  Gipson and Forest Park's attorney decided to place Golson and Milton on administrative leave with pay.

An OSBI investigator interviewed Golson, Gipson, and Milton.  After the interviews, the investigator presented the matter to an Oklahoma County assistant district attorney.  On September 18, 2019, the attorney declined to file criminal charges in the case "due to multiple issues with the victim's allegations and inconsistent statements."  Doc. no. 71-13.  A "Case Closure" report was issued by the OSBI on October 7, 2019, closing the case.  According to that report, the first sexual assault occurred on January 19, 2019, and the second assault occurred in March or April 2019.  *Id.*

12

Golson testified in deposition that Milton sexually assaulted her on two occasions at the police department. The first incident occurred on January 19, 2019. Golson testified in deposition that she did not know the exact date of the second incident.  Golson testified that she did not report the incidents when they happened because Milton had threatened to hurt her and her family.

Golson's grandmother, Anita Taylor (Taylor) testified in deposition that Golson had not attended her annual July 4th cookout, that Golson was not herself during that time, and that she later revealed that she had been sexually assaulted. Taylor thought it had occurred sometime in July.

Milton testified in deposition that during his paid administrative leave, Gipson had asked him to work a shift because no one was available.  Milton utilized an access code to open the door into the police department.  When Mayor Cobb saw Milton at the police department, he told Milton he was not supposed to be working. Mayor Cobb called Gipson, who called Milton to tell him to go home.  Milton testified that he normally worked between 16 to 32 hours "a month." Doc. no. 101-2, ECF p. 4, ll. 20-22. While on paid administrative leave, Milton received pay for 32 hours of work per pay period.  Further, Milton had been absent from work from 10:05 a.m. May 19, 2019 until 1:05 p.m. on June 9, 2019.

Golson was not asked by Gipson to work while on paid administrative leave. She also was not able to utilize the access code to access the municipal building for a meeting in August of 2019.  However, on that same day, she saw Milton approach a secure access door, enter a code, and pass through the doorway.  In certain pay periods of her employment, Golson had worked more than 32 hours.  During her paid administrative leave, she was initially paid for 32 hours per pay period.  Later the pay was increased to 41 hours.  Her leave pay was calculated by averaging the number of hours she worked during a sixth month period.  Doc. no. 101-33, ECF p.

78.  According to Golson, because her timecard was taken, her time records were not kept accurately and her pay often did not reflect the actual hours she worked.

In August of 2019, Golson was approached by Barbara Miller (Miller), a member of the Forest Park Board of Trustees.  Miller told Golson, who was wearing a dress, that she could see her "nipples," and she needed to put on a bra.  Doc. nos. 101-23 and 101-24.

At a special meeting held on November 12, 2019, Golson and Milton were given an opportunity to address the members of Forest Park's Board of Trustees. Thereafter, a majority of the members voted to terminate the employment of Golson and Milton.

According to Gipson, he had recommended to the trustees that Golson be terminated based on her public criticism of the department, her violations of uniform policy, her attitude toward other officers, repeated instances of insubordination, failing to stay within the chain of command, and for her overall negative attitude.

Analysis

*Section 1983 Equal Protection Claim Against Milton*

Milton seeks summary judgment on Golson's § 1983 equal protection claim,[1] arguing that it is time-barred.  A two-year statute of limitations applies for Golson's § 1983 claim.  *See*, Price v. Philpot, 420 F.3d 1158, 1162 (10th Cir. 2005).  The claim would have accrued, for limitations purposes, upon commission of the wrongful act and harm to Golson.  *See*, Colby v. Herrick, 849 F.3d 1273, 1279 (10th Cir. 2017);

---

[1] "The Fourteenth Amendment to the United States Constitution provides that '[n]o state shall . . . deny to any person within its jurisdiction the equal protection of the laws.'"  Murrell v. School District No. 1, Denver, 186 F.3d 1238, 1249 (10th Cir. 1999).  "Denials of equal protection by a municipal entity or any other person acting under color of state law are actionable under 42 U.S.C. § 1983."  *Id*.  "'[S]exual harassment by a state actor can constitute a violation of the equal protection clause.'"  *Id*. (citing Starrett v. Wadley, 876 F.2d 808, 814 (10th Cir. 1989)).

see also, Price, 420 F.3d at 1162 (A § 1983 action "accrues when the plaintiff knows or has reason to know of the injury which is the basis of the action.").

In her amended complaint, Golson claimed that she was sexually assaulted by Milton on two occasions, both resulting in physical injury. The court previously ruled that Golson could not rely upon the first alleged sexual assault, which occurred on January 19, 2019, because it clearly fell outside the two-year limitations period.[2] Doc. no. 32, ECF pp. 16-17. However, the court concluded that Golson could rely on the second alleged sexual assault because it was not clear from the amended complaint when it occurred and whether it fell outside the two-year limitations period.

In his motion, Milton argues that the second alleged sexual assault likewise falls outside the two-year limitations period. The undisputed facts, Milton contends, reveal that Golson repeatedly told authorities that the alleged assault occurred in March or April 2019. Milton contends the undisputed facts also reveal that as of March 19, 2019, he was no longer Golson's Field Training Officer and, thus, he did not work the same shift as her. Given that any alleged assault in March or April of 2019 would have occurred more than two years before the filing of Golson's action, Milton argues that Golson's § 1983 claim against him, as a matter of law, is time-barred.

In response, Golson does not question the court's prior ruling as to the first alleged sexual assault. She concedes that the first alleged assault occurred on January 19, 2019, outside the applicable two-year limitations period for a § 1983 claim. However, she asserts that due to the nature of the alleged second sexual assault, and its effect on her, she cannot recall exactly when the alleged second assault occurred. She represents that it "absolutely could have, and most likely did

---

[2] Golson commenced this action on May 7, 2021.

occur on June 8, 2019," making her original complaint, filed on May 7, 2021, timely. Doc. no. 102, ECF p. 7. Golson also proffers her deposition testimony wherein she testified that the second assault could have occurred after March and April 2019. And she also testified in deposition that the second incident was "anywhere between March or up to maybe the first week of July[.]" Doc. no. 103-1, ECF p. 34, ll. 24-25. Additionally, Golson proffers her June 2019 work schedule, prepared by Milton, which shows that she and Milton would have been at the police station at the same time on June 1 and June 8 because they were scheduled for back-to-back shifts on those days. Further, Golson proffers deposition testimony of Taylor, her grandmother, wherein she testified that Golson did not attend her annual July 4th cookout, that Golson was not herself, and that Golson later told her that she had been sexually assaulted and she thought it occurred in July. Further, Golson proffers evidence that she initially consulted with her attorney on June 13, 2019, suggesting that the alleged sexual assault could have occurred on June 8, 2019.

Milton, in reply, proffers a declaration by Richmond, who now serves as Forest Park's Town Administrator, declaring that Milton did not work on June 1, 2019 or June 8, 2019. According to Richmond, Forest Park's records show that Milton did not work at the police department from 10:05 a.m. on May 19, 2019 until 1:05 p.m. on June 9, 2019.

In sur-reply, Golson points out that her June 2019 work schedule also shows that she was scheduled to work on June 9, and based on that schedule and Richmond's declaration, Golson and Milton would have been at the police department at the same time on June 9. Golson therefore argues that the record evidence does not conclusively show that her § 1983 claim is time-barred.

Viewing the record evidence, in a light most favorable to Golson, and mindful that weighing of credibility is a matter for the jury, the court concludes that Golson has proffered sufficient evidence to raise a genuine issue of material fact as to

whether the alleged second sexual assault occurred after May 7, 2019. The court therefore concludes that Milton is not entitled to summary judgment on Golson's § 1983 claim. The evidence in Golson's favor on this issue is shaky at best, but even shaky evidence can sometimes be sufficient to get a claim past summary judgment.

*Title VII Claims – Forest Park*

      *i.*     *Gender Discrimination – Disparate Treatment*

Title VII prohibits an employer from discriminating against an employee "with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex[.]" 42 U.S.C. § 2000e-2(a)(1). "A plaintiff can prove [] sex discrimination with direct or circumstantial evidence." <u>Adamson v. Multi Community Diversified Services, Inc.</u>, 514 F.3d 1136, 1145 (10th Cir. 2008). "Direct evidence demonstrates on its face that the [adverse employment action] was discriminatory." *Id*. (citation omitted). "Circumstantial evidence permits the fact finder to draw a reasonable inference from facts indirectly related to discrimination that discrimination, in fact, has occurred." *Id*. (citation omitted). In her motion, Golson does not suggest that direct evidence of gender discrimination exists. Therefore, it appears that Golson relies upon circumstantial evidence to establish her Title VII disparate treatment claim.

"When evidence of discrimination is circumstantial, rather than direct, a plaintiff's claim is subject to the *McDonnell Douglas* burden-shifting framework." <u>Tabor v. Hilti, Inc.</u>, 703 F.3d 1206, 1216 (10th Cir. 2013) (citation omitted). "Under *McDonnell Douglas*, a plaintiff carries the initial burden of establishing a prima facie case of discrimination." *Id*. (citation omitted). A prima facie case of gender discrimination generally requires a plaintiff to show "she is a member of a protected class, she suffered an adverse employment action, and the challenged action occurred under circumstances giving rise to an inference of discrimination." <u>Bennett v. Windstream Communications, Inc.</u>, 792 F.3d 1261, 1266 (10th Cir. 2015)

(footnote omitted).  If a plaintiff establishes her prima facie case, "the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions." *Id*.  If the defendant satisfies its burden, the burden shifts again to plaintiff "to show that the defendant's explanation was merely pretextual." *Id*.  "[A] prima facie case, combined with sufficient evidence to find that the employer's justification is false, may permit the trier of fact to conclude the employer unlawfully discriminated." *Id*. (alteration in original; quotation marks and citation omitted).

In its motion, Forest Park first challenges Golson's ability to establish a prima facie case of gender discrimination.  Specifically, it argues that Golson does not have evidence to support the third prong of the prima facie case – the adverse employment action occurred under circumstances giving rise to an inference of discrimination.

Upon review, the court agrees that Golson has not submitted sufficient evidence to create a genuine issue of material fact as to the third prong with respect to her disciplinary suspension or her termination.  A plaintiff may establish the third prong in several ways, such as that she "was qualified for [her] job . . . and [] the job was not eliminated after [her] discharge," "actions or remarks made by decisionmakers that could be viewed as reflecting a discriminatory animus," "preferential treatment given to employees outside the protected class," or "more generally, upon the timing or sequence of events leading up to [her adverse employment action]."  Singh v. Cordle, 936 F.3d 1022, 1037 (10th Cir. 2019) (quoting Kendrick v. Penske, Transp. Services, Inc., 220 F.3d 1220, 1229 (10th Cir. 2000)); Plotke v. White, 405 F.3d 1092, 1101 (10th Cir. 2005).  However, with her papers, Golson has not proffered evidence sufficient to support any of the described ways of establishing the third prong as to the disciplinary suspension or the termination.  The court concludes that Golson has failed to submit sufficient evidence to raise a genuine issue of material fact that her disciplinary suspension or

her termination occurred under circumstances giving rise to an inference of discrimination.  The court therefore concludes that Golson has failed to establish a prima facie case of gender discrimination with respect to her disciplinary suspension and termination.  Consequently, the court finds that Forest Park is entitled to summary judgment to the extent Golson alleges a gender discrimination claim based on her disciplinary suspension or her termination.  *See*, Barlow v. C.R. England, Inc., 703 F.3d 497, 505 (10th Cir. 2012) ("If the plaintiff does not establish a prima facie case, [her] entire case fails.").

In her papers, Golson additionally argues that when she was placed on administrative leave with pay pending investigation into the alleged sexual assaults, she was treated differently from Milton, the male perpetrator, who was also placed on administrative leave with pay.  Golson points out that during the paid administrative leave, Gipson allowed Milton to work, and Milton had code access to the police department.  She was not allowed to work and did not have code access.  Golson additionally points out that she and Milton were paid for 32 hours for the two-week pay period, even though Milton testified he only worked between 16 to 32 hours a month and did not come into work between 10:05 a.m. on May 19, 2019 and 1:05 p.m. on June 9, 2019.  She, on the other hand, had worked several pay periods shortly before the paid administrative leave in excess of 70 hours per pay period and had received overtime pay.

Forest Park contends that although Milton testified that he was asked by Gipson to work one shift, Cobb, Forest Park's Mayor, upon seeing him, told Milton he was not supposed to be working and called Gipson on the issue.  Gipson thereafter told Milton to go home.  Forest Park also asserts that the code Milton used to enter the police department was "universal" to all its employees.  With respect to pay, Forest Park contends that Golson and Milton were not treated differently as they were paid for the same number of hours, that Golson did not work the number of

19

hours she claims to have worked, and that she did receive an increase of pay to 41 hours per pay period for three pay periods prior to her termination in November of 2019.

Upon review, the court concludes that, while a close issue, Golson has proffered sufficient evidence to raise a genuine issue of material fact as to each of the elements of her prima facie case of gender discrimination based on her administrative leave with pay. As stated, to establish a prima facie case of gender-based disparate treatment, Golson is required to show "she is a member of a protected class, she suffered an adverse employment action, and the challenged action occurred under circumstances giving rise to an inference of discrimination." Bennett, 792 F.3d at 1266. There is no dispute that Golson can establish the first prong since she is female. As to the second prong—adverse employment action—Golson must show a "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Piercy v. Maketa, 480 F.3d 1192, 1203 (10th Cir. 2007). The Tenth Circuit has not determined in a published opinion whether paid administrative leave qualifies as an adverse employment action. *See*, Lincoln v. Maketa, 880 F.3d 533, 542 (10th Cir. 2018). In an unpublished decision, the Tenth Circuit affirmed the district court's conclusion that placing an employee on paid administrative leave for eighteen days pending the outcome of an investigation was not an adverse employment action. *See*, Juarez v. Utah, 263 Fed. Appx. 726, 736-37 (10th Cir. 2008). However, in addition to the approximately three-month administrative leave period, Golson also proffers evidence that she suffered adverse consequences, particularly with respect to her pay. Viewing the evidence in a light most favorable to Golson, the court concludes that Golson has raised a genuine issue of material fact as to whether she suffered an adverse employment action.

With respect to the third prong of her prima facie case, the court concludes that Golson has proffered evidence sufficient to show that the adverse employment action occurred under circumstances giving rise to an inference of discrimination. Specifically, Golson has submitted evidence to create a genuine issue of fact that Milton was given preferential treatment while placed on paid administrative leave.

Assuming without deciding that Forest Park has met its burden of production of a legitimate nondiscriminatory reason or reasons for its actions, the court also concludes that Golson has proffered sufficient evidence to raise a genuine issue of material fact that Forest Park's reason or reasons are unworthy of belief and therefore a pretext for gender discrimination. Accordingly, the court concludes that Forest Park is not entitled to summary judgment on Golson's gender discrimination claim to the extent it is based on her placement on paid administrative leave.

### ii.    *Hostile Work Environment – Sexual Harassment*

An employee can also make out a Title VII claim of sex discrimination based on a hostile work environment. *See*, Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 66 (1986). However, to do so, "'a plaintiff must show (1) that she was discriminated against because of her sex; and (2) that the discrimination was sufficiently severe or pervasive such that it altered the terms or conditions of her employment and created an abusive working environment.'" Pinkerton v. Colorado Department of Transportation, 563 F.3d 1052, 1058 (10th Cir. 2009) (quoting Medina v. Income Support Div., 413 F.3d 1131, 1134 (10th Cir. 2005)).

In its motion, Forest Park does not challenge whether Golson can establish the first element of her hostile work environment claim based on the alleged sexual

assaults by Milton.[3]   Instead, it argues that it is entitled to summary judgment because Golson cannot establish that the alleged sexual assaults qualify as objectively severe or pervasive conduct.  According to Forest Park, Milton's alleged sexual assaults, even if credited on summary judgment,[4] were not severe or pervasive enough to give rise to liability under Title VII.

"To prove severity or pervasiveness, a plaintiff must subjectively and objectively perceive the harassment."  Ford v. Jackson National Life Insurance Company, 45 F.4th 1202, 1227 (10th Cir. 2022) (citing Throupe, 988 F.3d at 1252). "This means the plaintiff must: (1) subjectively perceive 'the conduct to be severe or pervasive,' and (2) 'show that a rational jury could find that the workplace is permeated with discriminatory intimidation, ridicule, and insult.'"  Id. (quoting Throupe, 988 F.3d at 1252).  Severity and pervasiveness are analyzed by looking at the totality of the circumstances and considering "'such factors as the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'"  Id. (quoting Morris v. City of Colo. Springs, 666 F.3d 654, 664 (10th Cir. 2012)).   "A few isolated incidents of discriminatory conduct and run-of-the-mill boorish, juvenile, or annoying behavior

---

[3] Nonetheless, with respect to Milton's alleged sexual misconduct, the court concludes that the evidence is sufficient to establish gender-motivated behavior.  Macias v. Southwest Cheese Co., LLC, 624 Fed. Appx. 628, 635 (10th Cir. 2015) ("[T]he inference [of gender-motivated behavior] is easy to draw if the harasser and the harassed employee are of the opposite sexes, at least when the conduct at issue involves explicit or implicit proposals of sexual activity.")  (quoting Harsco Corp. v. Renner, 475 F.3d 1179, 1186 (10th Cir. 2007)).

[4] In its papers, Forest Park contends that Golson cannot rely solely on her uncorroborated testimony or statements to support her claims, suggesting it is self-serving.  But self-serving testimony or evidence is competent to oppose summary judgment.  See, Greer v. City of Wichita, Kansas, 943 F.3d 1320, 1325 (10th Cir. 2019).  The court concludes that Golson did not need to provide corroboration of her firsthand observations of Milton's alleged sexual misconduct.  Her version of what occurred is based on her own personal encounters with him and can be used to create genuine issues of material fact.

that is not uncommon in American workplaces are insufficient to support a claim for hostile work environment." *Id*. (quotations marks and citations omitted).  Whether the alleged harassing conduct was severe or pervasive is typically a question for the jury, but if the plaintiff fails to make this showing, summary judgment is appropriate. *See*, Throupe, 988 F.3d at 1252.

On July 24, 2019, Golson made a report to the Oklahoma County Sheriff's Office that Milton had sexually assaulted her on two occasions.  In a handwritten statement, Golson reported that on the first occasion, which occurred on January 19, 2019, Milton pulled her into the police department bathroom and tried to kiss her. She turned her head, but he grabbed her by the back of the neck with his hand, and with the other hand turned her face and kissed her.  She told him "no," and she told him she was married.  Doc. no. 73-11, ECF p. 2.  The officer with the Oklahoma County Sheriff's Office also reported that Golson told him that Milton felt her breast and rubbed up and down her body with his hands during the incident.  Doc. no. 73-10, ECF p. 3.  As to the second occasion, Golson reported in her written statement that she thought it occurred in April of 2019, but has testified in deposition that she is unsure of the exact date of the incident.  According to Golson, on the second occasion, Milton grabbed her again in the same way and took her into the bathroom and placed her hand on his penis, grabbed her, and kissed her.  The officer reported Milton's penis as "erect."  *Id*.  Golson also reported Milton grabbed her "nipple." Doc. no. 73-11, ECF p. 3.  She pulled and pushed away, told him "no," and she left the building.  *Id*.  In deposition, Golson testified that during each of the alleged sexual assaults, Milton threatened Golson and her family, stating that he would hurt them.  Doc. no. 101-1, ECF p. 35, ll. 14-21.

Viewing the record evidence in a light most favorable to Golson,[5] the court concludes that the evidence raises a genuine issue of material fact about whether Milton's conduct was sufficiently severe to alter the terms of Golson's employment and create an abusive working environment. A reasonable jury could conclude that the circumstances were "particularly threatening or humiliating" and involved the "groping of body parts." *See*, Throupe, 988 F.3d at 1255. The court concludes that Forest Park is not entitled to summary judgment as to whether Golson can establish a hostile work environment based on the alleged sexual assaults by Milton.[6]

---

[5] In its motion, Forest Park relies on the description of alleged sexual assaults reported by the OSBI investigative officer. Doc. no. 71-13. The officer's report states that, on the first occasion, Milton "attempted to kiss" Golson and does not mention Milton feeling her breast and rubbing up and down her body with his hands. As to the second occasion, he does not mention Milton grabbing her nipple. The court, however, views the record before it in a light most favorable to Golson. And–as to this and a whole raft of other issues–the assessment of Golson's credibility is a matter for the jury.

[6] In her papers, Golson suggests that her hostile work environment claim is also based on her encounter with Barbara Miller in August of 2019. However, the court concludes that Golson has not proffered sufficient evidence to raise a genuine issue of material fact that she was discriminated against by Miller because of her sex or gender.

In Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 79-80 (1998), the Supreme Court held that both opposite-sex and same-sex sexual harassment are actionable under Title VII, but that such harassment violates Title VII only when it is "because of sex." "The term 'sex' under Title VII refers to a class delineated by gender." Dick v. Phone Directories Co., Inc., 397 F.3d 1256, 1263 (10th Cir. 2005) (citation omitted). Thus, even for same-sex sexual harassment claims, "[if] the nature of an employee's environment, however unpleasant, is not due to her gender, she has not been the victim of sex discrimination as a result of that environment." *Id*. (quotation marks and citation omitted).

The Supreme Court in Oncale established three ways a plaintiff can establish same-sex harassment: (1) if the harasser was homosexual and motivated by sexual desire; (2) if the harassment was motivated by a general hostility to the presence of a particular gender in the workplace; and (3) if the harasser treated men and women differently in the workplace. Oncale, 523 U.S. at 80-81. Golson has failed to adduce evidence to establish any of the three methods with respect to the alleged harassing conduct of Miller.

Even if Golson did raise a jury question as to whether Miller discriminated against her because of her sex or gender, Golson has failed to show that the discrimination was sufficiently severe or

Even though Golson proffers sufficient evidence to raise a genuine issue of material fact as to an actionable hostile work environment, Forest Park also contends that it cannot be held liable for the alleged unlawful misconduct.

An employer may be directly or vicariously liable for an actionable hostile work environment. Faragher v. City of Boca Raton, 524 U.S. 775, 806-07 (1998). The applicable theory of liability depends on "the status of the harasser." Vance v. Ball State Univ., 570 U.S. 421, 424 (2013).

> If the harassing employee is the victim's co-worker, the employer is liable only if it was negligent in controlling working conditions. In cases in which the harasser is a "supervisor," however, different rules apply. If the supervisor's harassment culminates in a tangible employment action [] the employer is strictly liable. But if no tangible employment action is taken, the employer may escape liability by establishing, as an affirmative defense, that (1) the employer exercised reasonable care to prevent and correct any harassing behavior and (2) that the plaintiff unreasonably failed to take advantage of the preventive or corrective opportunities that the employer provided. [] Under this framework, therefore, it matters whether a harasser is a "supervisor" or simply a co-worker.

Id.

In Vance, the Supreme Court held that an employee is a "supervisor" for purposes of vicarious liability under Title VII if he or she "is empowered by the employer to take tangible employment actions against the victim." Id. at 424, 450.

---

pervasive to alter the terms or conditions of her employment and created an abusive work environment.

Golson has also presented evidence concerning remarks made at her CLEET refresher training course, actions taken by Doolittle to run her tag, and alleged misinformation given by Duffiney regarding her work performance. However, Golson has not argued that these incidents support her hostile work environment claim, and the court declines to address them.

A tangible employment action is "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Id*. at 429 (quotation marks and citation omitted). However, "an employee need not be empowered to take such tangible employment actions directly to qualify as a supervisor. A manager who works closely with his or her subordinates and who has the power to recommend or otherwise substantially influence tangible employment actions, and who can thus indirectly effectuate them, also qualifies as a 'supervisor' under Title VII." Kramer v. Wasatch County Sheriff's Office, 743 F.3d 726, 738 (10th Cir. 2014).

Forest Park argues that Milton was not Golson's supervisor for purposes of vicarious liability. It asserts that Milton "did not have the authority to make significant employment decisions such as hiring, firing, promoting, or reassigning duties during [] Golson's employment." Doc. no. 71, ECF p. 20, ¶ 51. In support of the assertion, Forest Park cites paragraph 3 of Gipson's declaration, doc. no. 71-18. However, the court notes that paragraph 3 of the declaration does not support Forest Park's assertion. Further, the assertion does not indicate whether Milton had any authority to make "a decision causing a significant change in benefits." Vance, 570 U.S. at 429.

In any event, the court concludes that Golson has proffered sufficient evidence to raise a genuine issue of material fact as to whether Milton was her supervisor. According to the record, when Golson was allegedly sexually assaulted the first time, Milton served as Golson's Field Training Officer, responsible for training Golson as a reserve officer. In that position, Milton worked closely with Golson and was empowered to make evaluations as to her performance in her position. A poor evaluation could have substantially influenced her continuation as a reserve officer or assignment to any specialized task. When Golson was allegedly sexually

26

assaulted the second time, Milton was tasked with the responsibility of scheduling Golson for work. With the benefit of all reasonable inferences from the evidence in her favor, Golson has raised a genuine issue of material fact as to whether Milton was empowered to make a decision causing a significant change in Golson benefits, *i.e.* her pay.

Because Golson has raised a genuine issue of material fact as to whether Milton was a supervisor for purposes of Title VII, the court must determine whether Golson has proffered sufficient evidence to allow a reasonable jury to conclude that Milton's alleged sexual assaults "culminated" in a tangible employment action. There is no question that Golson's termination constitutes a tangible employment action. Pinkerton, 563 F.3d at 1059. However, Golson cannot show that a supervisor's harassment "culminated" in a tangible employment action by demonstrating that the tangible employment action followed the harassment. Helm v. Kansas, 656 F.3d 1277, 1287 (10th Cir. 2011). Golson must establish "a strong causal nexus" between Milton's harassment and the tangible employment action. *Id*. at 1059-61.

It appears that Golson seeks to establish a causal nexus based on a subordinate bias theory. Golson points to Milton making a formal written complaint about her and having Duffiney email his concerns about Golson to him. However, "'[t]o prevail on a subordinate bias claim, a plaintiff must establish more than mere 'influence' or 'input' in the decisionmaking process. Rather, the issue is whether the biased subordinate's discriminatory reports, recommendation, or other actions caused the adverse employment action.'" Pinkerton, 563 F.3d at 1060 (quoting EEOC v. BCI Coca-Cola Bottling Co., 450 F.3d 476, 487 (10th Cir. 2006)). Even viewing the record evidence in a light most favorable to Golson, the court concludes that Golson has not proffered evidence sufficient to establish her subordinate bias theory. Golson has failed to submit evidence sufficient to create a genuine issue of

27

material fact as to an assertion that Milton's formal written complaint, recommendation of removal or other actions caused her termination.[7,8]

Because Golson has not raised a genuine dispute as to whether the alleged unlawful harassment "culminated" in her termination, the court turns to the Faragher/Ellerth affirmative defense raised by Forest Park. To take advantage of the defense, Forest Park must demonstrate (1) it exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (2) that the employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. Faragher, 524 U.S. at 807; Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 765 (1998).

The first element of the Faragher/Ellerth defense imposes two distinct requirements: (1) the employer must have exercised reasonable care to prevent sexual harassment, and (2) the employer must have exercised reasonable care to correct promptly any sexual harassment that occurred. Pinkerton, 563 F.3d at 1062. Viewing the evidence in a light most favorable to Golson, the court concludes that Golson has proffered sufficient evidence to raise a genuine issue of material fact as to the first requirement – whether Forest Park exercised reasonable care to prevent the alleged sexual harassment. While it is undisputed Forest Park had a sexual harassment policy, "the employer must also disseminate the policy." Helm, 656

---

[7] The court also notes that under Tenth Circuit precedent, an employer can also "avoid liability by conducting an independent investigation of the allegations against an employee." Pinkerton, 563 F.3d at 1060-61 (quotation marks and citation omitted). "[S]imply asking an employee for his version of events may defeat the inference that an employment decision . . . was discriminatory." Id. The record reveals that Golson and her legal counsel was given an opportunity to address the members of Forest Park's Board of Trustees at the special meeting held on November 12, 2019.

[8] In her papers, Golson suggests that Milton's conduct also culminated in her disciplinary suspension. The court, however, finds that Golson has failed to adduce sufficient evidence to establish a causal nexus between Milton's alleged unlawful harassment and her disciplinary suspension.

F.3d at 1288.  Golson has submitted evidence that she did not receive the policy until June or July of 2019.  Although the record contains evidence that a physical copy of the policy was kept in the reserve office and was also maintained on the "N-Drive" of the police department's computers, and Golson had access to the "N-Drive" while performing background investigations, there is no evidence to demonstrate that Golson was aware of the existence of the written policy document in the reserve office or on the "N-Drive."  The court concludes that a genuine issue of material fact exists as to whether Forest Park exercised reasonable care to prevent the alleged sexual harassment.

With respect to second element of the Faragher/Ellerth defense, the court concludes that Golson has presented evidence sufficient to raise a genuine issue of material fact as to whether she unreasonably failed to take advantage of Forest Park's complaint procedures or otherwise avoid harm.  Golson has proffered evidence that she does not know the exact date of the alleged second sexual assault and that it may have occurred sometime in June or even in early July, that she did not receive the sexual harassment policy until June or July, and that Milton had threatened to hurt her or her family during both alleged sexual assaults.  While Forest Park points out that Golson knew how to report a sexual harassment claim because she had done it at four prior employers, the court concludes that the record evidence, viewed in Golson's favor, is sufficient to create a jury question as to the second element of the defense.

Because a finding on the first and second elements of the Faragher/Ellerth affirmative defense depends on disputed issues of material fact, the court concludes that Forest Park is not entitled to summary judgment on the affirmative defense. Golson's Title VII hostile work environment claim must proceed to trial.

*iii.*    *Retaliation*

Title VII also prohibits an employer from retaliating against an employee because the employee "has opposed any practice made an unlawful employment practice [under Title VII]."  42 U.S.C. § 2000e-3(a).  It appears that Golson relies upon circumstantial evidence to establish her retaliation claim.  The court therefore concludes that it should analyze Golson's retaliation claim under the McDonnell Douglas framework.

To state a prima facie case of retaliation, a plaintiff must establish three elements: (1) she engaged in protected opposition to discrimination; (2) she suffered an adverse employment action; and (3) there is a causal connection between the protected activity and the adverse employment action.  See, O'Neal v. Ferguson Const. Co., 237 F.3d 1248, 1252 (10th Cir. 2001).

As to the first element, Golson's complaint to Gipson of Milton's sexual harassment qualifies as protected opposition to discrimination.  Hertz v. Luzenac America, Inc., 370 F.3d 1014, 1015 (10th Cir. 2004) ("Protected opposition can range from filing formal charges to voicing informal complaints to superiors.").

With respect to the second element, Golson's termination qualifies as an adverse employment action for purposes of her retaliation claim.  See, O'Neal, 237 F.3d at 1255.  And the court assumes, without deciding, that Golson's disciplinary suspension qualifies as an adverse employment action.

The third element, causal connection, "may be shown by 'evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action.'"  O'Neal, 237 F.3d at 1253 (quoting Burrus v. United Tel. Co. of Kan., Inc., 683 F.2d 339, 343 (10th Cir. 1982)).  The Tenth Circuit has determined that a one and one-half month period between a protected activity and retaliatory conduct may by itself establish a causal connection, while a three-month period standing alone is not sufficient.  O'Neal, 237 F.3d at

1253.   And according to the Tenth Circuit, if the temporal proximity is not sufficiently close, the plaintiff must offer additional evidence of causation.  *Id*.

Further, the Tenth Circuit has stated that "[a]n employer's action against an employee cannot be *because* of that employee's protected opposition unless the employer knows the employee has engaged in protected opposition."  Petersen v. Utah Department of Corrections, 301 F.3d 1182, 1188 (10th Cir. 2002) (emphasis in original).

The court concludes that Golson has failed to proffer sufficient evidence to create a genuine issue of material fact that there is a causal connection between her complaint of sexual harassment and her disciplinary suspension.  In her papers, Golson contends that she put Gipson on notice of her sexual harassment complaint against Milton in the telephone conversation she had with him on July 11, 2019. However, the court concludes that no reasonable jury could find from that conversation that Gipson knew Golson was complaining of sexual harassment by Milton.  During the July 11th conversation, Golson never mentioned that Milton had sexually assaulted her.  She told Gipson she wanted to remind him that she needed to have a meeting with him and Richmond about "something that's been going on since January" and "it's serious."  Doc. no. 101-19, ECF p. 2, ll. 15-16.  Gipson responded that he was "not sure what [she was] talking about."  *Id*., l. 19.  Golson then stated, "[y]ou're not sure but you are aware because I've been saying this and I just got [the] policy two weeks ago."  *Id*., ll. 23-25.  Although Gipson then responded, "we know what's going – what goes on in the department," *id*., ECF p. 3, ll. 2-3, the court cannot conclude that a rational jury could reasonably infer from this response that Gipson knew that Milton had sexually assaulted Golson and that was the "something that's been going on since January."  The court concludes that

no reasonable jury could find that Gipson was notified by Golson on July 11, 2019 that Milton had engaged in sexual harassment or had sexually assaulted her.[9]

The record evidence indicates that Golson reported Milton's alleged sexual assaults after she was informed by Gipson of his intention to place her on disciplinary suspension. Because the decision to suspend was made before Golson reported Milton's alleged sexual misconduct, the court concludes that Golson cannot establish the causal connection element. The court finds that Golson cannot establish a prima facie case of retaliation with respect to the disciplinary suspension. Consequently, the court concludes that Forest Park is entitled to summary judgment on Golson's retaliation claim to the extent it is based on the disciplinary suspension. *See*, Zokari v. Gates, 561 F.3d 1076, 1082 (10th Cir. 2009) (affirming summary judgment on retaliation claim for failure to establish a prima facie case of retaliation).

As to Golson's termination, the court agrees with Forest Park that Golson cannot establish the causal connection element based on the temporal proximity between the protected activity and her termination. There is no dispute that the termination occurred more than three months after she reported the alleged sexual assaults. *See*, O'Neal, 237 F.3d at 1253 (three-month period standing alone is not sufficient to establish causal connection). Because the temporal proximity between her protected activity and the termination is not sufficiently close under Tenth Circuit precedent to establish the causal connection element, the plaintiff must offer additional evidence of causation. *Id*.

---

[9] To the extent Golson relies upon her telephone conversation with Gipson on July 24, 2019 to support causal connection, the court also concludes that no reasonable jury could find that Gipson was notified during that conversation that Milton had engaged in sexual harassment or had sexually assaulted her.

In her papers, Golson cites her July 11, 2019 telephone conversation with Gipson. Golson contends that she made it clear to Gipson during their second conversation on that day that there were serious issues that she wanted to discuss with him. After the conversation, Golson states that she was placed on suspension and that the basis for that decision was evidence gathered between July 11, 2019 and the day she was placed on suspension. Golson contends that there were no written reprimands or written reports about her alleged misconduct prior to July 11, 2019, except for the purported email composed by Richmond on June 6, 2019, which was resent on July 19, 2019. Golson contends that the information upon which her suspension was based was premised on information provided by Milton, which was gathered after her July 11th conversation with Gipson. And Golson contends that her termination was based on the same information gathered between July 11, 2019 and the day she was placed on suspension.

However, the court concludes that this additional evidence is not sufficient to raise a genuine issue of material fact as to the existence of a causal connection between the protected activity and her termination. As previously discussed, the court concludes that no reasonable jury could find that Gipson knew Golson was complaining of sexual harassment by Milton during the telephone conversation on July 11, 2019. The work performance information about Golson that was provided to Gipson by Milton, Duffiney and Richmond was provided prior to Golson advising Gipson of the alleged sexual assaults by Milton. Thus, Golson cannot establish a causal connection between her protected activity and the termination based on the July 11, 2019 telephone conversation with Gipson.

Although the July 11, 2019 telephone conversation is not sufficient evidence to support causation, the court, viewing the record evidence in a light most favorable to Golson, concludes that there is other proffered evidence sufficient to raise a genuine issue of material fact as to causation. Gipson testified in deposition that the

disciplinary hearing he had called for in the July 20, 2019 letter (the pre-termination hearing set for July 26, 2019) was for the purpose of trying to correct "some things" they felt "needed correction." According to Gipson, they weren't "trying to fire anybody." Doc. no. 71-1, ECF p. 16, ll. 7-10. After Golson reported the alleged sexual assaults by Milton, and Gipson had reported the sexual harassment claim to Smitherman and Cobb, Golson was placed on paid administrative leave. Thereafter, on August 5, 2019, Golson telephoned Gipson, and he told her, "this ain't good news." Doc. no. 101-22. He informed her that the pre-termination hearing that they were supposed to have had on July 26, 2019 was now moved to August 12, 2019, and she would have to "state" her case before Forest Park's Board of Trustees. Gipson told Golson that he didn't know who had called for that hearing, but that it was going to happen. Golson asked him if the pre-termination hearing was a "termination hearing." *Id*. Gipson told her several times that he didn't think "that" would happen. *Id*. But he acknowledged that that was his gut feeling and he didn't know what "people" think. *Id*. It is unclear from the record whether the August 12th hearing occurred as scheduled but it suggests that it did. However, Golson continued to remain on paid administrative leave after that date. In September of 2019, an Oklahoma County assistant district attorney declined to file criminal charges against Milton based on the alleged sexual assaults. Thereafter, in October of 2019, the OSBI case was closed, and a special meeting was then called on November 12, 2019 by the Forest Park Board of Trustees to address the employment of both Golson and Milton. And both Golson and Milton were terminated. The court concludes that the record evidence, viewed in a light most favorable to Golson, creates a genuine issue of material fact as to whether there is a causal connection between her sexual harassment complaint against Milton and her termination.

Because the record contains sufficient evidence to create a genuine issue of material fact as to each of the elements of Golson's prima facie case of retaliation,

the burden shifts to Forest Park "to produce a legitimate, nondiscriminatory justification for taking the disputed employment action." Stover v. Martinez, 382 F.3d 1064, 1071 (10th Cir. 2004). The court finds that Forest Park has satisfied its burden of production. According to the proffered evidence, Gipson recommended Golson's termination to Forest Park's Board of Trustees based on her public criticism of the department, her violations of uniform policy, her attitude toward other officers, repeated instances of insubordination, failing to stay within the chain of command, and her overall negative attitude.

Because Forest Park has articulated facially legitimate nondiscriminatory reasons for Golson's termination, the burden shifts back to Golson to provide evidence showing that Forest Park's proffered reasons are a pretext for discrimination. Stover, 382 F.3d at 1071. Notably, Golson's burden "is only to demonstrate a genuine dispute of material fact as to whether the proffered reasons [are] unworthy of belief." Bausman v. Interstate Brands Corp., 252 F.3d 1111, 1120 (10th Cir. 2001) (quotation marks and citation omitted).

Viewing the evidence, and all reasonable inferences from that evidence, in a light most favorable to Golson, the court concludes that Golson has demonstrated a genuine dispute of material fact as to whether Forest Park's proffered reasons for her termination are unworthy of belief. Because a genuine issue of material fact concerning pretext exists, the court concludes that Forest Park is not entitled to summary judgment on the retaliation claim based on Golson's termination.

Conclusion

For the reasons stated, Defendant Joseph Milton's Motion for Summary Judgment (doc. no. 73) is **DENIED**. The Motion for Summary Judgment of Defendant Town of Forest Park (doc. no. 71) is **GRANTED in part** and **DENIED in part**.

This case will proceed to trial on plaintiff's § 1983 equal protection claim against defendant Joseph Milton.  It will also proceed to trial on plaintiff's Title VII claims against defendant Town of Forest Park for gender discrimination (based on plaintiff's placement on paid administrative leave), for a hostile work environment (based on alleged sexual harassment by defendant Joseph Milton), and for retaliation (based on plaintiff's termination).

IT IS SO ORDERED this 15th day of December, 2023.

STEPHEN P. FRIOT
UNITED STATES DISTRICT JUDGE

21-0466p031.docx